Larry BARNES, Appellant,

v.

GENERAL MOTORS CORPORATION
and Strafco, Inc., Appellees.

No. 16716.

Court of Appeals of Texas,
San Antonio.

May 18, 1983.
Rehearing Denied June 22, 1983.

James R. Warncke and John Oliver, San Antonio, for appellant.

G. Thomas Coghlan, Thomas Crofts, Jr., Groce, Locke & Hebdon, San Antonio, for appellees.

Before ESQUIVEL, CANTU and TIJERINA, JJ.

## OPINION

ESQUIVEL, Justice.

This is an appeal from a take-nothing judgment in a products liability and negligence case.

Appellant Larry Barnes (Barnes) sued appellee General Motors Corporation (General Motors) on the theories of strict liability and negligence for injuries to his back allegedly caused by his removal from inside his house of a burning refrigerator that had been manufactured by General Motors. General Motors cross-claimed against its service representative and distributor, Appellee Strafco, Inc., d/b/a Straus-Frank Company (Strafco), for indemnity or contribution claiming that Strafco was negligent in servicing the Barnes refrigerator. Barnes amended and brought in Strafco as additional defendant asserting the same negligence claimed by General Motors in its cross-action. After a jury trial, judgment was entered on the verdict that Barnes take nothing. It is from this judgment that Barnes prosecutes this appeal. We affirm.

On the night of December 15, 1978, Barnes was awakened by the smell of smoke and upon investigation found his refrigerator on fire. He removed the refrigerator by himself from the kitchen to the outside patio where he put the fire out with a garden hose. While struggling with the burning refrigerator in order to get it out of the house, he experienced a sharp pain in his back as he attempted to lift the refrigerator over the door sill of the door leading from the kitchen to the outside patio.

Barnes attempted to impose strict liability upon General Motors by alleging that the fire was caused by a short in the defrost timer of the Barnes refrigerator due to a manufacturing defect and a design defect. The alleged manufacturing defect was the improper sealing of the outer shell of the refrigerator and improper sealing of a grommet inside the refrigerator through which grommet the electrical wiring passed to the defrost timer. The improper sealing of the outer shell permitted moisture to accumulate inside the refrigerator and to migrate down the electrical wiring, through the improperly sealed grommet, and on to the leads of the defrost timer, causing a short in the defrost timer.

The alleged design defect was that there was a leak in the outer shell of the refrigerator which caused moisture inside the refrigerator to migrate down the electrical wiring inside the refrigerator and, because of the improper positioning of the electrical wires leading to the defrost timer from the grommet area and the improper positioning of the defrost timer in the refrigerator, the moisture could reach the terminals of the

defrost timer causing a short in the defrost timer.

In points of error numbers 1 and 2 Barnes complains of the legal sufficiency of the evidence to sustain the jury's answers to special issues numbers 3 and 4–A, and contends further that such answers are against and contrary to the overwhelming preponderance and great weight of the evidence so as to be clearly wrong and manifestly unjust.

In their answer to special issue number 3, the jury found that the Barnes' refrigerator was not defectively designed. In their answer to special issue number 4–A, the jury found that a leak in the shell of the refrigerator did not render it defective. The jury found it unnecessary to answer whether either defect was the producing cause of Barnes' injuries.

■■■■ When, such as in the instant case, "no evidence" and "insufficient evidence" points of error are raised, we must rule upon the "no evidence" point first. *Glover v. Texas General Indemnity Company*, 619 S.W.2d 400, 401 (Tex.1981); *see*, Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Texas L.Rev. 361, 369 (1960). In deciding the "no evidence" or legal sufficiency question raised by Barnes, we must consider only the evidence and the inferences tending to support the findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). With this rule in mind we will consider Barnes' "no evidence" or legal sufficiency contention with respect to the jury's findings of the non-existence of a defective design and defective manufacture of the Barnes' refrigerator.

However, we would first point out that because of the rules of review as set out above, we see no benefit to Barnes if we find that there was no evidence to support the jury finding that General Motors did not defectively design the Barnes' refrigerator, or that there was no evidence to support the jury finding that the leak in the shell of the Barnes' refrigerator did not render the same defective. Barnes would be entitled to have the judgment reversed and rendered in his favor only·if the evidence established conclusively that General Motors did defectively design the Barnes' refrigerator and/or if the evidence established conclusively that the leak in the shell of the Barnes' refrigerator rendered it defective. It follows therefore, that if we were to sustain either or both of Barnes' points of error, we could not reverse and render a judgment in his favor based on the findings of the jury, because in arriving at this determination we are prohibited from considering all evidence and inferences that General Motors did defectively design the Barnes' refrigerator or that the leak in the shell of the Barnes' refrigerator did render it defective. In any event, we will proceed to consider Barnes' "no evidence" contention.

In special issue number 3 the trial court correctly submitted the question whether the Barnes' refrigerator was defectively designed by General Motors along with the following definition of the term "defectively designed": ". . . a product that is unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use." In special issue number 4–A the trial court submitted the question whether the manufacturing defect consisting of a leak in the shell of the Barnes refrigerator rendered the same defective, along with the following definition of the term "defective": ". . . a condition of the product that renders it unreasonably dangerous."

Restatement (Second) of Torts § 402A (1965), the strict liability rule, provides that a manufacturer may be held liable for damages caused by a defective product that is unreasonably dangerous, and that a product may be defective due to either its design or its manufacture. We conclude, therefore, that strict liability as to General Motors depends as a matter of law not upon whether a defect existed in the Barnes' refrigerator on the day of the fire, but whether the Barnes' refrigerator was unreasonably dangerous at the time it left the hands of General Motors because of a defective condition.

88

The strict liability rule is applicable only when the defective condition of the product makes it unreasonably dangerous to the user or consumer. Restatement (Second) of Torts § 402A(1) Comment i (1965). Therefore, the issue before us in determining Barnes' no evidence contention is whether there is any evidence that the Barnes' refrigerator was not unreasonably dangerous, as designed at the time it left the hands of General Motors and that it was not rendered unreasonably dangerous by its manufactured condition.

The witness Marvin O. Ross testified as an expert that the Barnes' refrigerator was of a like model as a test refrigerator that had caught on fire in the laboratory of General Motors in 1972. As a result of an examination of the Barnes' refrigerator some 18 months after it burned he came to the conclusion that the fire in the Barnes' refrigerator originated in the same location as that of the test refrigerator and both fires were caused by the same defects. He estimated that the Barnes' refrigerator was the 1 in 100,000 refrigerators manufactured along with the test refrigerator where the fire originated in the same place as the test refrigerator. Ross further testified that he did not consider the defects in the test refrigerator to make it unreasonably hazardous, and that the defects in the test refrigerator were not design defects but manufacturing defects.

■ There is evidence that the Barnes' refrigerator was in use from the date it was purchased on October 1, 1972, by its original owner, the witness Janet Grant, until the day of the fire on December 15, 1978, when it was owned by Barnes. There is evidence of only two specific problems with the Barnes' refrigerator during these six years of use. The witness Clifford Waldron, a refrigerator repairman for Strafco, testified that he had made two repair calls, one for a leakage problem in May, 1977, and a noise problem in the condensor fan motor sometime in July. Barnes himself testified that he experienced no problems with the refrigerator, not even a leak, until the night of the fire. We are of the opinion that the

jury could have reasonably inferred that a refrigerator such as the Barnes' refrigerator that manifested a problem only twice in six years of use did not pose an unreasonable danger or risk of injury while in use. We therefore conclude that there was evidence, and clearly more than a scintilla, to support the findings of the jury that the Barnes refrigerator was not defectively designed by General Motors when it left General Motors' hands and that the manufacturing defect of the leak in the seal of the shell of the Barnes' refrigerator did not render the same "defective".

■ In deciding Barnes' factual insufficiency contention, we must consider all of the evidence and determine whether the jury findings are so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). *See,* Garwood, The Question of Insufficient Evidence on Appeal, 30 Texas L.Rev. 803, 805 (1952). It will, therefore, be necessary to set out herein the pertinent evidence presented at the trial of this case, in addition to that evidence heretofore set out.

The witness Ross further testified that the test refrigerator was found to have an improperly sealed shell; that this created a leak in the shell of the refrigerator which permitted moisture to accumulate inside it. That the cause of the fire was the migration of the moisture down the electrical leads that led to the bottom of the cabinet under the refrigerator and caused an arc between the two terminals on the defrost timer. The sealing problem was cured in subsequent models by the application of a sealant different than the original sealant in the test refrigerator and in order to avoid a future arc in the terminals of the defrost timer due to moisture reaching the terminals, the defrost timer was repositioned and turned around on its mount. As to all other like models as the test refrigerator, General Motors sent a letter to all of its distributors on October 11, 1972, and advised its distributors of "... some failures of defrost timers in the subject refrig-

erator...." At the same time General Motors recommended certain modifications and corrections be made to like models by the distributors or their dealers. General Motors also requested of its distributors that this policy be "campaigned," i.e., the distributors were to notify all dealers to locate these like model refrigerators and complete the recommended service. Ross further testified that he examined the Barnes' refrigerator some 18 months after the fire and in his opinion the fire in the Barnes' refrigerator was caused by the same problem that General Motors was trying to correct with their suggested modifications. In his opinion, the fire in the Barnes' refrigerator was a "typical failure that General Motors had contemplated" when they issued the policy letter of October 11, 1972. His examination of the Barnes' refrigerator further revealed that the suggested corrections and modifications were never done to the Barnes' refrigerator. His examination of the burned parts of the Barnes refrigerator led him to the conclusion that the fire commenced in the defrost timer and that the fire was caused by the defect in the Barnes' refrigerator of not being properly sealed in the cabinet, not being properly sealed at the grommet, and not having the wire properly led to the defrost timer. On cross-examination, Ross admitted that the test refrigerator had a manufacturing defect but not a design defect. However, he did not consider it unreasonably hazardous. In his opinion the policy letter from General Motors viewed the defect in the test refrigerator to be a very serious hazard. Ross estimated that the Barnes' refrigerator was the 1 in 100,-000 refrigerators of like model manufactured by General Motors to have burned because of a short in the defrost timer such as the test refrigerator.

The witness Chauncey Claiborne Ulbrich, testifying on behalf of Barnes, testified that he moved into a house owned by his aunt Janice Grant in 1974, 1975 or 1976. On May 17, 1977, he signed a repair estimate order on his aunt's refrigerator which read as follows: "Found water between cabinets. Runs to front door, then to a screw in cabinet floor. Needs shop repair to be sealed. Estimate 85.00. Customer will call back if wants same repaired." He had called a repair man from Metro Appliances on that day because the refrigerator had been leaking periodically during the preceding 6 months. Ulbrich further testified that the work was never done on the refrigerator in connection with what the serviceman had recommended be done. That at the time he had no concern about an electrical short, just about water on the floor.

The witness Janice Grant, testifying for General Motors, testified that she was the original owner of the Barnes' refrigerator having purchased it October 1, 1972.

Barnes testified that he moved into the Grant house November 1 or 7, 1978, when he purchased the house from Ms. Grant. At that time he swapped his refrigerator for the one in the house. He used the refrigerator up until the night of the fire. He noticed no leaks and experienced no trouble with it until the night of the fire.

The witness Clifford Waldron testifying on behalf of Strafco testified that he checked the Barnes' refrigerator on May 17, 1977, and also on July, 1977. The May call was for a leak that caused water on the floor; that at the time he examined the refrigerator he was not aware of the modifications and corrections suggested by General Motors so he did not perform them on the refrigerator. He further testified that even if he had been aware of the recommended modifications he would not have performed them because the refrigerator was too wet inside and they would not have worked. His second trip in July was for a noisy condensor fan motor; that at the time he noticed no leak. It was established from Waldron that Metro Appliance was a service firm for Strafco and that Metro Appliance had received notice of General Motors' policy letter of October 11, 1972.

The witness Gregory Stethness testifying on behalf of Barnes, testified that he examined the Barnes' refrigerator six or eight months after the fire. He concluded from

his examination that the fire in the Barnes' refrigerator originated in the defrost timer and in his opinion the moisture in the timer was a design defect. He was not sure whether the fire would have occurred in the Barnes' refrigerator had the modifications and corrections recommended by General Motors been done.

The witnesses Willie Franks and Arlin Rogge, testifying as experts for Strafco testified that they examined the Barnes' refrigerator a few days after the fire. Both were of the opinion that the fire was not caused by moisture in the defrost timer but rather that the fire originated in the relay adjacent to the defrost timer.

There is no direct evidence that the Barnes' refrigerator was defectively designed when it left the hands of General Motors. The evidence further showed that all such model refrigerators had a condensate pan because there was normal leakage in such refrigerators that created moisture in them. There is no direct evidence that the grommet through which the electrical leads passed through to the defrost timer terminals was leaking at the time it was manufactured or at the time of the fire.

■ Barnes contends that because the witness Ross testified as an official representative of General Motors that General Motors cannot now deny that the Barnes' refrigerator was defective. We find no merit to this argument. Ross's admissions that the test refrigerator was defective were enough to provide knowledge of a defect in the test refrigerator by General Motors but we refuse to conclude that these admissions indirectly proved that General Motors knew about the defects in the Barnes' refrigerator at the time it left their hands or at the time of the fire. Ross's testimony merely raised an issue of fact as to whether the Barnes' refrigerator was defectively designed or manufactured and this issue was resolved against Barnes by the jury. We hold that there is no competent evidence against General Motors to prove the fact essential to the strict liability theory submitted to the jury by the trial court in special issues 3 and 4-A, i.e., that

when the refrigerator left the hands of General Motors it was in such a defective condition either by design or manufacture so as to make it unreasonably dangerous. Accordingly, Barnes' points of error numbers 1 and 2 are overruled.

Barnes attempted to impose tort liability upon General Motors under the doctrine of res-ipsa loquitur by alleging that the fire in the Barnes' refrigerator would not have occurred in the absence of negligence on the part of General Motors in manufacturing the refrigerator. Barnes alleged that Strafco's failure to make the recommended modifications and corrections to the Barnes' refrigerator prior to the fire constitutes negligence. In answer to special issue number 1 the jury found that Barnes' negligence was the only proximate cause of the occurrence in question. In his third point of error, Barnes complains of the legal and factual sufficiency to support the findings of the jury.

It is implicit in the findings of the jury in their answer to special issue number 1, that the actions or inactions of Barnes constitute negligence and such negligence was the proximate cause of his injuries. There was sufficient evidence of probative force to uphold the findings of the jury.

■ Where the jury findings are challenged as being contrary to the overwhelming weight and preponderance of the evidence we must consider all of the evidence in the case, including that which is contrary to the verdict, and set aside the verdict and remand the cause for a new trial if we conclude that the verdict is so against the weight and preponderance of the evidence as to be manifestly unjust. *In Re King's Estate, supra.* Before we can disregard the jury's implied findings that Barnes' actions or inactions constitute negligence, we must be prepared to hold that Barnes established by a preponderance of the evidence that the ordinary prudent man would have acted as Barnes did under the same or similar circumstances. The evidence furnished a basis, as distinguished from sheer speculation, for the jury to determine that Barnes had sufficient time to comprehend the situation

and react differently from the way he reacted that night in his kitchen. In determining what an ordinarily prudent man would do under given circumstances, the time available for realization and reaction is of extreme importance. *Caughman v. Glaze,* 412 S.W.2d 357, 361 (Tex.Civ.App.—San Antonio 1967, writ ref'd n.r.e.). Barnes testified that he handled the refrigerator without getting burned; that it took him from three to six minutes to eventually get the refrigerator out on to the patio; that he did not wait for his neighbor to help him; that in his panic it did not occur to him to connect up the garden hose out in the patio and bring the hose into the house or stand in the doorway and throw water on the burning refrigerator. Under the evidence in this case, we cannot say that the jury's finding of negligence was against the preponderance of the evidence. Accordingly, Barnes' point of error number three is overruled.

Our determination of Barnes' points of error numbers 1, 2 and 3 are dispositive of this appeal. We therefore do not address Barnes' remaining points of error.

The judgment of the trial court is affirmed.